W. H. STEVENS, Trustee, Appellee, v. OTTUMWA COLD STOR-
AGE & ICE COMPANY, Appellant.

**BONDS:** Requisites and Validity—Want of Consideration—Proof.
Proof of want of consideration for corporate bonds ought to be
decidedly clear, when they were issued under unanimous con-
sent of all the stockholders, and under the supervision and ap-
proval of the state authorities having control over such mat-
ters.

*Appeal from Wapello District Court.*—D. M. ANDERSON,
Judge.

FEBRUARY 8, 1918.

SUIT in equity to foreclose mortgages. The defendant
is a corporation, and executed the mortgages as such. The
first mortgage was for $50,000, and the second for $25,000.
Each purported to secure an issue of bonds, respectively, of
like amount. One bond for $1,000 had been paid before
suit. The defense interposed was that the bonds were void
for want of consideration. The trial court found that no
want of consideration was shown as to the first mortgage.
It found, also, a failure of consideration as to the second
mortgage, to the extent of $10,000. It entered a decree for
the plaintiff for $64,000 and interest. The defendant ap-
pealed, and the plaintiff filed a cross-appeal.—*Affirmed.*

*J. J. Smith,* for appellant.

*C. W. Whitmore* and *F. G. Orelup,* for appellee.

EVANS, J.—The plaintiff, appellee, has filed certain mo-
tions to affirm, tendering therein a waiver of his own appeal
for the purpose of such affirmance. The motions were sub-
mitted with the case. The nature of the motions is such as

to render the reading of the record necessary. An examination of the full record satisfies us that the defendant has no fair ground to complain of the decree of the trial court. It is more satisfactory to us, therefore, to dispose of the case briefly on its merits than to deal with the motions, which are somewhat complicated. The defendant corporation is a successor in interest and organization to a former corporation, known as the Ottumwa Brewing and Ice Company. This latter company had operated for many years as a brewery, and had an extensive physical property in the city of Ottumwa. In February, 1913, through certain proceedings had, the Ottumwa saloons and brewery were closed. This resulted in an assignment for the benefit of creditors on the part of the brewing company. For many years, this company had carried an indebtedness of $50,000, represented by an issue of bonds, which was secured by a mortgage upon all its plant. Certain of its stockholders, being six in number, acquired all its stock and all its outstanding bonds. The district court ordered a sale of the property by the assignee, providing in the order that the outstanding bonds of the company should be accepted from any bidder as the equivalent of cash, and providing further that no bid should be accepted for less than the full amount of the bonds, plus certain other estimated outlays. The property sold for $53,000. It was bought by the six men who were the owners of all the stock and the owners of all the bonds, at the stated bid of $53,000. They thereupon organized the present defendant corporation, which took over all the property of the former brewing company. The same men, known in the record as the syndicate, took the entire issue of stock. They also issued bonds to the amount of $50,000, in lieu of the bonds and mortgage formerly existing upon the brewing company. Later, a second issue of bonds for $25,000 was ordered, and a mortgage given to secure the same. These issues of bonds and the execution of the mortgages to secure

the same were done by the unanimous vote of the stock-
holders. Compliance also was had with the statutory re-
quirements pertaining to the approval of the executive coun-
cil, both as to the issue of stock and as to the issue of bonds.
The property was carried for some time as dead property. A
considerable expense was incurred in its proper mainte-
nance. A salaried person was kept in charge of it. Repairs
had to be made and insurance maintained. There were also
some subsidiary companies connected with the larger com-
pany, and owned by the same stockholders. These were
organized with a view of attempting to utilize particular
parts of the idle property. For instance, a part of the
property had been leased, some years before, to one Dennis,
who operated the same as an ice company. The use of the
property for such purpose required a considerable outlay on
the part of Dennis, in equipping the same with proper fa-
cilities for storing and handling ice. The lease with Dennis
provided that, at the expiration thereof, Dennis should have
the right of removal of all such improvements and equip-
ment as should be put on by him, unless the lessor should
exercise the option of purchasing such equipment at actual
cost. The actual cost of the equipment was about $10,000.
At the expiration of such lease, the owners of the defend-
ant corporation deemed it to their interest to purchase the
equipment for $10,000, rather than to allow a dismantling
of it. This investment of $10,000 represents a part of the
consideration for the $25,000 bond issue. In addition there-
to, there was much outlay by these stockholders for legiti-
mate purposes, all of which they prorated among them-
selves in proportion to their interest, and the sum total was
included in the bond issue. The case is wholly a fact case.
The record is voluminous, and the facts could not be fully
discussed with any degree of detail without undue length
of opinion, which could serve no permanent interest. The
burden is upon the defendant to prove the failure of con-

sideration. No question of fraud or false representation is made in the issues, although there is a claim of that kind made in the argument of appellant. The plaintiff is trustee for the bondholders. These bonds failed to circulate in the money market, and, they are owned and held by the stockholders who caused their issue. There was much testimony heard at the trial upon the subject of the value of the property of the plant. Evidence on behalf of the defendant appellant was to the effect that such property was worth from $35,000 to $40,000 only; whereas evidence on behalf of the plaintiff shows the same to have had a value of more than $200,000. There is something to be said for both views, wide apart as they are. The property was not a going concern. This, of itself, would greatly depreciate its market value as a whole. How much it would depreciate it would be, to some extent, a matter of guesswork. If the property could be utilized advantageously, it could fairly be said to be worth approximately what it would cost to reproduce it. On this theory, the larger values were, perhaps, not greatly exaggerated. But the difficulty was to utilize it. Its cost, therefore, was not a criterion of its value. It was like a ship cast upon the land. It would cost as much to build it there as to build it anywhere. But its value in such a place could not be measured by the cost of building it there. And so this ship of the brewing company found itself in a dry place, and the question of value became largely a question of salvage. We do not deem the question of great materiality, so far as it bears upon the question of consideration for the bonds.

The bonds and mortgages having been issued with the consent of all the stockholders, and with the approval of the executive council, and in compliance with the statutes of the state, their validity ought not to be lightly assailed. If the same stockholders had continued to hold their stock, and if they were interposing this defense in the name of the

corporation, it would present a rather ludicrous situation. Has the corporation improved its position for the purpose of defense by the change of the stockholders? The situation created lent itself to the possibility of fraud in the sale of the stock. If fraud was perpetrated, there is abundant remedy for that. None is pleaded here. It appears in the evidence that the syndicate disposed of all their stock to one Fullington, in a land trade. No concealment or deception on their part is claimed in that trade. The property of the corporation was visible. The transfer of the entire issue of stock was practically a transfer of the property. Fullington indisputably knew that the property was mortgaged for $75,000 to secure the bond issues of the corporation for the same amount. Fullington had no fears in the trade. What he gave in exchange was an option to purchase 12,000 acres of stump land in Louisiana, at $8 per acre. The transaction was well characterized by the trial court as a "trade of elephants." The bigger the elephant, the larger the cost of maintenance. According to appellant's showing, Fullington appears to have disposed of some of this stock advantageously, and perhaps fraudulently. The present president of the corporation became such by the investment of $17,000 in 8,000 shares of the stock. It is an appalling fact, if true, and we should not deal lightly with it, if it were before us for appropriate relief. But the fact has nothing to do with the question whether there was a consideration for the bonds, and the court cannot permit itself to be deflected by it from the real issue. We have said enough to indicate the general nature of the facts and the controversy. We think the defendant got all that it was entitled to in the decree below, by a reduction of the recovery to the extent of $10,000.

Plaintiff's appeal will be treated as waived by his tender. The decree below will be affirmed on both appeals. —*Affirmed.*

PRESTON, C. J., LADD and SALINGER, JJ., concur.